

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JJD:JRS
F. #2023R00449

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 20, 2026

<u>By Email and ECF</u>

The Honorable Peggy Cross-Goldenberg
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re: <u>United States v. Daniela Alejandra Sanchez Ramirez, et al.</u>
             <u>Criminal Docket No. 26-37 (SJB)</u>

Dear Judge Cross-Goldenberg:

      The government respectfully submits this letter to request that permanent orders of detention be entered against the defendants Daniela Alejandra Sanchez Ramirez, Marlyn Yulitza Salazar Pineda, Jhoan Sebastian Sanchez Ramirez, and Alexandra Patricia Sanchez Ramirez, whose arraignments are scheduled for tomorrow, Saturday, February 21, 2026.

      All of the defendants have been charged in the above-captioned indictment with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and two counts of aiding and abetting the false impersonation of an officer or employee of the United States, in violation of 18 U.S.C. §§ 912 and 2. In addition, defendant Jhoan Sebastian Sanchez Ramirez has been charged with wire fraud, in violation of 18 U.S.C. § 1343.

      The criminal conduct charged in the indictment is no ordinary fraud. The defendants undermined the rule of law and the integrity of our immigration system. As part of their fraudulent scheme, the defendants and their coconspirators doctored documents to appear as if they had been legitimately issued by agencies of the United States government. Even more brazenly, they orchestrated sham immigration proceedings held by videoconference, including court appearances that featured fake judges wearing robes and asylum interviews with phony agents dressed in law enforcement uniforms. Representative photographs of two of these proceedings are set forth below.

 

The defendants engaged in this criminal conduct entirely because of greed, lining their own pockets and those of their coconspirators in Colombia to whom they laundered tens of thousands of dollars of victims' funds. In doing so, the defendants demonstrated a complete and utter disregard for the potentially life-altering consequences that their actions inflicted on their victims—vulnerable individuals who not only lost significant funds, but also missed their actual immigration court appearances. At least one victim was ordered deported in absentia as a result.

Against this backdrop of the exceptionally serious nature of their charged criminal conduct, the defendants also present a serious flight risk given their robust connections overseas to other coconspirators and bank accounts, as well as their lack of permanent ties to the United States. Indeed, three of the defendants were arrested this afternoon while boarding a flight to Colombia using one-way tickets.

As set forth in additional detail below, there is no condition or combination of conditions that can reasonably secure the defendants' appearances in court as required or the safety of the community. Accordingly, the government respectfully requests that the Court detain the defendants pending trial.

I. Factual Background[1]

As described in the indictment, for over two years, the defendants and their coconspirators portrayed themselves as immigration lawyers and operated a fictitious immigration

---

[1] The government is entitled to proceed by proffer in a detention hearing. See United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).

law firm that they called "CM Bufete De Abogados Consultoria Migratoria." After soliciting prospective "clients," primarily on Facebook, the defendants and their coconspirators charged each of their victims hundreds to thousands of dollars for nonexistent legal advice and services. None of the defendants or their identified coconspirators were attorneys admitted or licensed to practice law in any jurisdiction in the United States.

After receiving victim funds, the defendants and their coconspirators pretended as if they were actually representing their "clients." They transmitted fraudulent documents that appeared official on their face and included symbols of agencies of the United States government. Some of these documents referenced the victims' actual cases in immigration court and/or reflected that the victims' pending cases had been successfully resolved. In reality, none of these were legitimate documents issued by any United States government agency.

The defendants and their coconspirators also facilitated sham immigration proceedings held on video, including asylum interviews and court appearances. While legitimate immigration proceedings are conducted entirely in English, the participants in the scheme spoke in Spanish to lull the victims into a false sense of security. During these videoconferences, the impersonators asked the victims sensitive questions and requested the victims' personal identifying information. Several of these fictitious proceedings featured impersonators of immigration judges, agents from the United States Customs and Border Protection and the United States Citizenship and Immigration Services, and immigration lawyers. They wore judicial robes and law enforcement uniforms and appeared in front of backgrounds that resembled courtrooms and government offices, including featuring agency seals and flags.

By way of example, the below stills were excerpted from a recording surreptitiously made by a victim. One of the defendants charged in the indictment who has not yet been arrested appears in what looks to be a law enforcement uniform in front of a Department of Homeland Security flag and a background that says, "United States Citizenship and Immigration Services." According to the victim, the defendant misrepresented himself/herself as an immigration judge.

 

At times, the defendants and their coconspirators falsely represented that these sham proceedings had resolved the victims' pending immigration cases. As a result, victims missed their actual appearances in immigration court, which resulted in at least one victim being ordered deported unknowingly. The defendants and their coconspirators also threatened their victims. For example, when one victim realized that the law firm was fake and sought other legal

counsel instead, the defendants and their coconspirators sent the victim aggressive messages in return, including threats of deportation and demands for additional payment.

In total, the investigation has identified well over $100,000 in fraudulent transactions transmitted by victims to the defendants and other individuals associated with the fake CM Bufete De Abogados Consultoria Migratoria law firm. Bank and Zelle records for several defendants reflect that they received thousands of dollars directly from known victims of their scheme. The transaction descriptions associated with these victim payments demonstrate that the victims intended to receive legal representation in return. Certain of the defendants' financial records show that in addition to laundering victim funds to bank accounts overseas, the defendants kept some of the funds for themselves, including paying for personal expenses, such as meals ordered on DoorDash.

As part of the investigation into the defendants' criminal activity, the government has reviewed the contents of several of the defendants' iCloud accounts pursuant to judicially-authorized search warrants. Communications among the defendants and their coconspirators, along with other recovered evidence, make clear the level of sophistication of their scheme and their utter indifference to the real-world implications of their criminal conduct on the lives of their vulnerable victims.[2]

By way of example, both Daniela Alejandra Sanchez Ramirez and Jhoan Sebastian Sanchez Ramirez communicated repeatedly with multiple victims while purporting to be immigration attorneys. Their iCloud accounts are also filled with messages documenting their transferring of victim funds into their personal bank accounts. Additionally, Alexandra Patricia Sanchez Ramirez sent multiple messages to her coconspirators in which she kept track of the earnings of each participant in the scheme and reported on the percentage of victim funds that each coconspirator was entitled to keep for themselves as profit.

The defendants also discussed the logistics and day-to-day operations of their fraudulent scheme, including the misrepresentations that they made to their victims. By way of example, on one occasion, Daniela Alejandra Sanchez Ramirez asked Marlyn Yulitza Salazar Pineda to guide her in interacting with prospective clients who sought legal representation from their fictitious law firm. In response, Marlyn Yulitza Salazar Pineda provided her with coaching and instructed her on possible responses she could send victims regarding immigration law. When Daniela Alejandra Sanchez Ramirez expressed concern to Marlyn Yulitza Salazar Pineda that she would "mess up" in these victim communications, Marlyn Yulitza Salazar Pineda sought to motivate her, telling her that she should feel confident when she lied to prospective clients and misrepresent to the victims that their law firm had been endorsed by immigration authorities.

II. Applicable Law

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the

---

[2] The communications referenced herein are summarized in sum and substance and in part rather than verbatim.

4

crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice." Id. "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

If the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order" a defendant detained. 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

The government may proceed by proffer to establish facts relevant to a detention determination. United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

Abuhamra, 389 F.3d at 320 n.7.

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence" against the defendant; (3) the history and characteristics of the defendant, including the defendant's "character," "financial resources," "length of residence in the community," "community ties," and "past conduct"; and (4) "the nature and seriousness of the danger" posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

III.     Each of the Defendants Should Be Detained Pending Trial

Based on the serious nature of the charged offenses, the strength of the evidence, the defendants' abilities and incentives to flee, as well as their extensive ties outside of the United States given their Colombian citizenship and connections to funds and coconspirators overseas,

the government respectfully submits that no bail package will adequately ensure the defendants' return to court and protect the community from additional criminal activity that they may commit if released. The factors set forth in 18 U.S.C. § 3142(g) thus weigh heavily in favor of each of the defendants' pretrial detention.

First, the defendants' criminal activity is exceptionally serious and caused tremendous harm to dozens of victims. Their offense conduct in and of itself shows their danger to the community. Although the principal charges here are non-violent, it is well-established that defendants pose a danger to others not only when they commit acts of violence, "but also when it is likely they will commit non-violent acts that are detrimental to the community." United States v. DiSano, No. 18-CR-337-3 (WFK), 2018 WL 11191538, at *2 (E.D.N.Y. Dec. 14, 2018). Here, the defendants' fraudulent scheme had a devastating impact on a multitude of victims across the country. Individual victims not only lost up to tens of thousands of dollars each, but certain victims had their actual immigration cases delayed and suffered adverse consequences when they missed their legitimate court appearances, including being ordered deported. The defendants engaged in this criminal conduct over and over again by trying to recruit new victims for well over two years, thus demonstrating the ongoing and sustained harm to others that they were willing to inflict. The danger posed by the defendants to vulnerable individuals militates strongly in favor of detention.

Furthermore, the nature of the defendants' charged offenses, which involved the impersonation of government officials, including judges, as well as the doctoring of government documents, is inherently dangerous and obstructive. Their conduct no doubt interfered with the proper administration of immigration proceedings administered by United States government agencies. Given their sustained criminal activity for over two years, there is no indication that the defendants will cease to engage in this same type of behavior in order to obstruct the instant criminal case. Further, the defendants have already attempted to obstruct justice and threatened to retaliate against their victims, many of whom will be witnesses should this case proceed to trial. The Court may find a risk of obstruction based on a "risk that [a defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). And federal law describes obstructive conduct broadly to encompass many of the acts that the defendants have already committed. See 18 U.S.C. § 1513(e) (criminalizing "knowingly, with the intent to retaliate, tak[ing] any action harmful to any person . . . for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any federal offense); 18 U.S.C. § 1519 (criminalizing "knowingly alter[ing], destroy[ing], mutilat[ing], conceal[ing], cover[ing] up, falsif[ying], or mak[ing] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States"). Detention is thus necessary to mitigate the risk of further obstruction by the defendants and any additional retaliatory conduct by the defendants against their victims.

The defendants also pose an untenable risk of flight. They have already demonstrated their ready ability to doctor fraudulent government documents. In addition, through their scheme, they have amassed a broad collection of victims' personal identifying information that they can misappropriate. As the Second Circuit has explained, "'apparent access to false documents' supports a finding that a defendant poses a risk of flight." United States v. Baig, 536

F. App'x 91, 93 (2d Cir. 2013) (quoting United States v. El-Hage, 213 F.3d 74, 80 (2d Cir. 2000)). Because the defendants have made clear their capability to impersonate others—including judges, government officials, and law enforcement officers—their risk of flight is exceedingly high, which further warrants their detention. See United States v. Sternquist, No. 22-MJ-1005(RLM), 2022 WL 6162532, at *2 (E.D.N.Y. Oct. 8, 2022) ("For obvious reasons, this access to false identification devices increases the defendant's capacity for flight.").

In addition, the evidence of the defendants' guilt is strong, which likewise incentivizes their flight. Should this case proceed to trial, the evidence will consist of voluminous documentary evidence, photographs, videos, communications (both written messages and recorded audio), financial records, and witness testimony. Where, as here, the weight of the evidence is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022); United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee."). In the face of this strong evidence, the defendants are subject to sentencing exposure of up to twenty years of incarceration should they be convicted. As courts have repeatedly held, the possibility of serving a lengthy prison term also provides an additional incentive to flee. See, e.g., United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) ("[E]ven if, as a practical matter, Khusanov's maximum sentence exposure were only 15, rather than 30, years' imprisonment, that would still be sufficient to provide him with a strong incentive to flee.").

The defendants' risk of flight is further elevated by their foreign ties and lack of permanent connection to the United States. None of the defendants is a United States citizen or legal permanent resident. They do not have permanent domiciles or strong roots in the community. In contrast, each of the defendants has extensive ties to Colombia, where all of them were born. When they were arrested, Daniela Alejandra Sanchez Ramirez, Jhoan Sebastian Sanchez Ramirez, and Alexandra Patricia Sanchez Ramirez were attempting to board a one-way flight from Newark Liberty International Airport to Colombia. By tracing the transfers of the financial proceeds of their fraudulent scheme, the government has learned that the defendants have access to a broad network of coconspirators and vast sums of money overseas. Should the defendants flee outside of the country while on pretrial release, there is also no guarantee that they would be compelled to return to face prosecution in the United States. Although the United States has entered extradition treaties with many countries, including Colombia, extradition under these treaties is never guaranteed and would inevitably involve protracted litigation. For all of these reasons, the defendants pose a flight risk.

Moreover, less restrictive conditions of release that the Court may impose, such as home detention or electronic monitoring, would insufficiently deter the defendants from fleeing. This is because when the risk of flight is so strong, as here, any such condition of release would "not prevent flight; at best, it limits a fleeing defendant's head start." United States v. Maxwell, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) (Nathan, J.) (internal quotation marks and citation omitted). There are numerous examples in this District of defendants cutting their ankle monitors

and fleeing, many of whom still remain at large. See, e.g., United States v. Svetlana Dali, 24-MJ-645 (JAM) (defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border); United States v. Horst Jicha, 23-CR-342 (OEM) (same the day before a status conference and he remains at large); United States v. Tony Clanton, 23-CR-328 (KAM) (defendant cut his location monitoring device on the eve of trial); United States v. William Bartell, 22-CR-80 (EK) (same within one week of being released on bail); United States v. Joey Macario, 22-CR-342 (HG) (defendant absconded after removing his location monitoring device after being released to attend drug treatment); United States v. Dewayne Tripp, 22-CR-336 (MKB) (defendant absconded instead of appearing at a bond revocation hearing and was only located after being arrested for a domestic violence incident); United States v. Marius Lacatis, 22-CR-190 (BMC) (defendant, a Romanian national involved in a fraud conspiracy, was released on bond, cut his location monitoring device, fled, and remains at large); United States v. Marcus Deloatch, 21-CR-457 (ENV) (defendant charged with Hobbs Act robbery cut his location monitoring device and fled in advance of a bail revocation hearing); United States v. Herman Baron, 21-CR-307 (NGG) (defendant charged with narcotics trafficking and COVID fraud cut his location monitoring device and fled one hour before his scheduled change-of-plea hearing and was only re-apprehended five months later); United States v. Michael Artis, 20-CR-409 (PKC) (defendant released following a violation of supervised release cut off his location monitoring device and failed to appear at bail revocation hearing); United States v. Charles May, 19-CR-539 (FB) (defendant charged with several counts of armed robbery absconded while on home detention and remains at large); United States v. Theressa Riddle, 17-CR-491 (JS) (defendant released on bond cut her location monitoring device and did not appear for bond violation hearing); United States v. Sinmyah Amera Ceasar, 17-CR-048, 19- CR-117, 22-CR-459 (KAM) (defendant cut her electronic monitoring device and tried to flee the country after the Second Circuit ordered her resentenced and government discovered evidence of violation of her release conditions); United States v. Guanghua Shen, 18-CR-302 (MKB) (defendant cut her electronic monitoring device at JFK airport the day before she was required to self-surrender to the Bureau of Prisons); United States v. Akmal Narzikulov, 13-CR-601 (RJD) (defendant cut his electronic bracelet just days after being released on bail); United States v. Julian Tzolov, 08-CR-370 (JBW) (defendant in a securities fraud scheme attempted to flee to Spain while on location monitoring).

Not only can any conditions of release that the Court may impose be readily circumvented by the defendants, but the defendants have already made clear their complete lack of respect for the administration of justice in the United States and our institutions of government, including courts. Based on this record, there is no basis to find that the defendants can be expected to abide by any orders that this Court may enter, including to return for future court appearances or to comply with specific terms of release.

IV. <u>Conclusion</u>

For all of the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly ensure the safety of the community or the defendants' return to court if they are released on bail. The government therefore requests that the Court order that the defendants be detained pending trial.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ James R. Simmons
James R. Simmons
Assistant U.S. Attorney
james.simmons@usdoj.gov
(718) 254-7511

cc: Clerk of Court (PCG) (By Email)
Counsel of Record (By Email)